In the Matter of ROBERT M. MORGENTHAU, as District Attorney of New York County, on Behalf of the PEOPLE OF THE STATE OF NEW YORK, Appellant, and JACK ROSENBERG, as Judge of the Criminal Court of the City of New York, Intervenor, v LAWRENCE H. COOKE, as Chief Judge of the Unified Court System of the State of New York, et al., Respondents.

First Department, March 30, 1982

APPEARANCES OF COUNSEL

*Robert M. Pitler* of counsel (*Amyjane Rettew* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Boris Kostelanetz* of counsel (*David F. Axelrod* with him on the brief; *Kostelanetz & Ritholz,* attorneys), for intervenor.

*Paul A. Feigenbaum* (*Michael Colodner* and *Kenneth Falk* with him on the brief), for respondents.

OPINION OF THE COURT

*Per Curiam.*

Petitioner-appellant is the District Attorney of New York County; respondents-respondents are, respectively, the Chief Judge of New York State, sued in his capacity as chief judicial officer of the State's Unified Court System, and the Chief Administrative Judge of the system, sued in his official capacity. On motion granted by this court, Criminal Court Judge JACK ROSENBERG, heretofore assigned temporarily to Supreme Court, was permitted to intervene in this appeal as a petitioner *ab initio*. The goal sought by petitioners is to prohibit implementation of a plan, recently promulgated by respondents, concerning temporary assignment of Judges of the courts of this city (NY Const, art VI, § 15) to the Supreme Court. It is the purpose of the plan, effective at the opening of the January term, 1982, to return those Judges, presently assigned upward, to the courts of the city from which they were selected originally, those with the longest such service first, to be followed by those with lesser time in the Supreme Court, all to be replaced by Judges from the lower courts, and all to be rotated periodically so that those desiring so to do may have the opportunity to achieve temporary upgrading.

By the time this case was heard at Special Term, the plan had actually gone into effect, with a shift of newly assigned Judges in place, and their predecessors returned to their original courts. Flowing from this circumstance is the subtle suggestion that to set aside the rotation scheme at this juncture would be unthinkable because it would bring about a chaotic situation in the courts and put into question those decisions rendered by temporarily upgraded Judges since the new plan was put into effect. This, however, is not a valid consideration in our disposition of this appeal.

The petition states in sum that the District Attorney's interest in halting the plan's operation derives from his office: as prosecutor of most of the cases heard in Supreme Court, New York County, he is vitally concerned with the quality and experience of judicial personnel presiding in

felony parts. He therefore desires to have experienced Judges retained in their present assignments, some of whom have enjoyed a higher status for as long as 10 years.

Special Term dismissed the petition on several grounds: that petitioner lacks standing, having no more than a "valid interest" in the situation; that respondents possessed the requisite authority to place their announced plan into operation; and that, in any event, the remedy of prohibition is not available to petitioner absent a clear legal right against a public official who is exceeding his authority.

The time schedule leading to institution of the plan appears to have been as follows. On September 21 last, it was announced by the Office of Court Administration, the Chief Administrator's agency, that a new plan of operation of the system of temporary assignment to Supreme Court would soon be forthcoming, involving the new elements of rotation of personnel and operation of a screening panel. On October 20, further details were released, particularly that the objective would be to achieve equality of assignment upward, with accompanying increased emoluments. On January 4, it was announced that those Judges of the city courts then sitting by assignment would be returned to their former courts, in order of seniority in the higher positions, to be replaced in Supreme Court by new designees, and that rotation in assignments would be the order of the day. The plan was then put under way.

Before turning to the merits of this case, we consider the aspect first taken up at Special Term, that of standing of the petitioner. We hold that the District Attorney has standing to maintain this action. (See *Boryszewski v Brydges,* 37 NY2d 361, 364-365, in which the holding in *Hidley v Rockefeller,* 28 NY2d 439, cited by Special Term, lost status as a precedent.) Further, petitioner will "bring the kind of interest that leads to full and vigorous presentation and exploration of the issues involved." (*Matter of Burke v Sugarman,* 35 NY2d 39, 44.) We find the District Attorney's interest to be "not abstract but personal, direct and substantial". (*Matter of Taylor v Sise,* 33 NY2d 357, 362.)

Now to turn to the merits. The basic law governing temporary assignment of Judges to Supreme Court is found in article VI of the Constitution as follows:[1]

"§ 26. [Temporary assignments of justices or judges to other courts]

"a. A justice of the supreme court may perform the duties of his office or hold court in any county and may be temporarily assigned to the supreme court in any judicial district or to the court of claims. A justice of the supreme court in the city of New York may be temporarily assigned to the family court in the city of New York or to the surrogate's court in any county within the city of New York when required to dispose of the business of such court.

"b. A judge of the court of claims may perform the duties of his office or hold court in any county and may be temporarily assigned to the supreme court in any judicial district.

"c. A judge of the county court may perform the duties of his office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his residence or to the county court or the family court in any county or to the surrogate's court in any county outside the city of New York or to a court for the city of New York established pursuant to section fifteen of this article.

"d. A judge of the surrogate's court in any county within the city of New York may perform the duties of his office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his residence.

"e. A judge of the surrogate's court in any county outside the city of New York may perform the duties of his office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his residence or to the county court or the family court in any

---

1. Pertinent statutes are found in the Judiciary Law. Sections 211, 212, and 213 virtually track the quoted sections of the Constitution. The statutes are of little importance in our consideration, the sections of the Constitution being controlling in any event.

county or to a court for the city of New York established pursuant to section fifteen of this article.

"f. A judge of the family court may perform the duties of his office or hold court in any county and may be temporarily assigned to the county court or the family court in any county or to the surrogate's court in any county outside of the city of New York or to a court for the city of New York established pursuant to section fifteen of this article.

"g. A judge of a court for the city of New York established pursuant to section fifteen of this article may perform the duties of his office or hold court in any county and may be temporarily assigned to the supreme court in the judicial department of his residence or to the county court or the family court in any county or to the other court for the city of New York established pursuant to section fifteen of this article.

"h. A judge of the district court in any county may perform the duties of his office or hold court in any county and may be temporarily assigned to the county court in the judicial department of his residence or to a court for the city of New York established pursuant to section fifteen of this article or to the district court in any county.

"i. Temporary assignments of all the foregoing judges or justices listed in this section shall be made by the appellate division of the supreme court of the department or departments concerned." (Subdivision i was amended in 1977 to read as appears immediately hereafter.)

Subdivision i as amended: "i. Temporary assignments of all the foregoing judges or justices listed in this section shall be made by the chief administrator of the courts in accordance with standards and administrative policies established pursuant to section twenty-eight of this article."

To return to the balance of section 26:

"j. The legislature may provide for temporary assignments within the county of residence or any adjoining county, of judges of town, village or city courts outside the city of New York.

"k. While temporarily assigned pursuant to the provisions of this section, any judge or justice shall have the powers, duties and jurisdiction of a judge or justice of the

court to which assigned. After the expiration of any temporary assignment, as provided in this section, the judge or justice assigned shall have all the powers, duties and jurisdiction of a judge or justice of the court to which he was assigned with respect to matters pending before him during the term of such temporary assignment."

Section 28 was adopted simultaneously with the newly amended subdivision i. Its pertinent subdivision c follows: "c. The chief judge, after consultation with the administrative board, shall establish standards and administrative policies for general application throughout the state, which shall be submitted by the chief judge to the court of appeals, together with the recommendations, if any, of the administrative board. Such standards and administrative policies shall be promulgated after approval by the court of appeals."

As stated at Special Term, there are no issues of fact in this case. It is not seriously disputed that the Chief Judge, at no time, in respect of the rotation and screening plan, did any of the things specified in section 28 of article VI of the Constitution. Not alone did he not establish standards and administrative policies — unless the various announcements made last autumn and winter be deemed such, and they are not — but he did not consult with the administrative board on the subject, nor submit the matter to the Court of Appeals for approval. Thus the flat mandate of the Constitution was ignored.

Several arguments presented by respondents in support of the claim of propriety of the new rules applicable to assignments in 1982 of Judges of the courts of the city to Supreme Court are easily refuted, based as they are on reasons that do not justify departure from constitutional imperatives. The history of constitutional enactments in America teaches that every grant of power should ideally be hedged about by checks and balances to protect the body politic from absolute power. Thus, every word of subdivision i of section 26 and subdivision c of section 28 should have been given meaning by full implementation. Special Term's memorandum opinion asserts "that respondents can make such assignments under the existing standard, which is to be found in 22 N.Y.C.R.R. 445," the Chief

Administrator's regulation; further, that "such temporary assignments could be made even if there were no existing standard." The authority cited is *Corkum v Bartlett* (46 NY2d 424) which reads precisely to the opposite effect when it comes to standards or policies: "Striking is the unqualified constitutional statement [NY Const, art VI, § 28, subds a-c] that 'the chief administrator * * * shall supervise the administration and operation of the unified court system.' * * * For, with respect to supervision or management, as distinguished from policy formulation, the Constitution places no limitations on the duties the Chief Judge may delegate to the administrator. And, neither consultation with the Administrative Board nor approval by the Court of Appeals is a prerequisite to the exercise of *supervisory* [emphasis added] powers by the Chief Administrator — a marked contrast with the restrictions placed on the establishment of 'standards and administrative *policies* [so emphasized in the original] for general application throughout the state' ". (*Corkum v Bartlett,* 46 NY2d 424, 428-429.)

"Subdivision c of section 28 of Article VI of the new constitutional provision mandates that before the Chief Judge may establish 'standards and administrative policies' he must consult with the Administrative Board and obtain the approval of the Court of Appeals." (*Corkum v Bartlett, supra,* p 430.) It was obviously error on Special Term's part to characterize temporary assignments — a problem of such importance that it is treated of in its own separate constitutional paragraph — as merely supervision and management. It is undoubtedly so that the main purpose of the scheme which centralized court administration was to transfer all administrative power theretofore held by the Appellate Divisions to one chief administrative head, relegating the Appellate Divisions to advisory and consultative status, but this cannot be read to mean that constitutional limitations were abandoned in the process. Such a limitation is obviously present in subdivision i of section 26, setting out how "[t]emporary assignments" are to be made. The kind of temporary assignment meant becomes clearly evident when other pertinent sources are carefully consulted. The two words are not restricted to the

daily bread-and-butter operations of the courts. Such a reading is belied by a simple scan of subdivision k of section 26, which spells out the enlargement of responsibilities in temporarily assigned status, and the extension of such responsibilities after "expiration of any temporary assignment" "with respect to matters pending before him [the assigned Judge] during the term of such temporary assignment." That reference is therefore pertinent to the kind of assignment covered by the rotation order.[2]

Special Term's opinion rationalizes that this plan, affecting the greater part of the State's court business, was purely a local matter. But the whole unified court scheme is not to be put into disjoint by fragmentation of this sort, a step that seems to be the very antithesis of unification. Section 28 speaks of the administrative board being consulted, not just its local members. Article VI addresses itself to one State-wide system for which policies are to be fashioned. This is not a simple matter of management, as, for example, would be the emergency replacement of a Judge who has suddenly become ill.

The Special Term opinion states further that section 445.1 (now called section 1.1) of the administrator's regulations (22 NYCRR 445.1) is in itself a sufficient statement of policy. Can it really be considered sufficient to cover a brand new rotation plan which represents a new departure after two decades of temporary assignment? And there is no choice as to the prerequisites: section 28 recites that "The Chief Judge * * * *shall* establish" (emphasis supplied), surely a mandatory verb. And section 445.1 (1.1) of the regulations cannot enlarge upon the superior law in the Constitution. Even that regulation specifically excludes temporary assignments from its purview. Accepting section 445.1 as an earlier statement of policy, it is therefore not the sort of policy, by its own terms and by those contained in subdivision i of section 26, to be read as a policy covering temporary assignments. As to temporary assignments, it is therefore no policy at all, and the argument that it is translates into a statement that no policy is

---

2. Also see temporary title of amendment to subdivision i of section 26: "§26. [Temporary assignments of justices or judges to other courts]".

the equivalent of a required policy, an argument that would have been relished by Lewis Carroll.[3]

Our thesis is uncomplicated and may be recited in simple terms. In 1977, to accommodate to a new administrative setup of the court system, our State Constitution (art VI, § 26 "[*Temporary assignments of justices or judges to other courts*]" [emphasis added]), subdivision i was amended, and addressed solely to that subject. The then Chief Judge — this is accepted — promulgated a policy (22 NYCRR 445.1) which, responsively, excepted that subject from its purview, i.e., powers and duties of the Chief Administrator. This was adopted in the full constitutional form prescribed by article VI (§ 28, subd c). No other set of standards and policy in respect of the subject of temporary assignments has ever been adopted in accord with subdivision c of section 28. The order to which this proceeding is addressed was not such a standard or statement of policy nor, were it such, did its promulgation comply with subdivision c of section 28. To which we add only that it is ludicrous to insist that a special paragraph in the Constitution was adopted simply to confirm the Chief Administrator's inherent power to carry on daily housekeeping!

One of the memoranda submitted by petitioner District Attorney states that "[t]he wisdom of the rotation policy has little to do with the constitutional issue to be decided. For, no matter how unwise or ill-advised the policy it would still be valid if the constitutional procedure were followed." We agree. Too much of the argument herein and too much of the public discussion concerning this case has dealt with motivations and other matters having nothing to do with the constitutional issue we face. We have no reason to believe other than that the subject plan was fashioned in accordance with the highest traditions of public service. Our disagreement is solely with the manner and method of its adoption. The very life of constitutional government depends on complete submission to the mandates of basic law. This is the error we find and we seek to correct it, as is our responsibility (see *Saxton v Carey*, 44

---

3. " 'When I use a word' Humpty Dumpty said, 'it means just what I choose it to mean — neither more nor less.' " (Alice's Adventures in Wonderland, ch 6.)

NY2d 545, 549), in the only way available to a court: to say so.

In form, this proceeding is one for a writ of prohibition of implementation of the rotation order under attack, in pursuit of which petitioner originally sought a preliminary injunction. In itself, that presents a nettlesome problem. Obviously, because of strictures of time imposed by the tight schedule adopted for commencement of the new plan, appropriate consideration of this appeal required that no precipitous action be taken to halt in its tracks a mass transfer of Justices, with possibly resultant chaos in the affected courts. We make no comment as to which party, if either, bears responsibility for these circumstances; we assume that all participants in this case acted in good faith. The resultant delay has been unavoidable up to this juncture, and will continue to pose difficulties until final resolution of this dispute upon further appeal, inevitable because we are a divided court. We have therefore chosen neither to prohibit nor to enjoin, but to translate (CPLR 103, subd [c]) our views into a declaratory judgment in this undoubtedly justiciable controversy (CPLR 3001), upon the basis of which an armory of individual remedies may be sought (Siegel, New York Practice, ch 16, subd [H], § 441, p 584) to afford appropriate relief in any situation affected by this holding.

Accordingly, the judgment of dismissal of the petition herein for a writ of prohibition, entered in Supreme Court, New York County (TYLER, J.), January 25, 1982, should be reversed, on the law, without costs, and the petition considered as though a complaint in an action for declaratory judgment, in which judgment should be entered in favor of plaintiff (petitioner)-appellant declaring that subdivision i of section 26 and subdivision c of section 28 of article VI of the Constitution of the State require that the new rotation plan of temporary assignment of Judges of the courts of the City of New York requires, as prerequisite to promulgation, the adoption of a standard and administrative policy in respect of the same, as well as consultation theretofore by the Chief Judge with the Administrative Board of the Courts and approval by the Court of Appeals and that there was no compliance therewith prior to promulgation

of the plan or at any time, and that therefore the plan of temporary assignment is without effect and void in respect of the manner of its promulgation.

SANDLER, J. P. (dissenting). Contrary to the view of the court majority, it seems to me clear that the actions of respondents challenged in these proceedings were authorized by a standard and administrative policy promulgated in accordance with article VI (§ 28, subd c) of the State Constitution. Accordingly, I find it unnecessary to address the issues that would be presented if, as found by the court, the respondents acted without such authorization, other than to note my doubt that the court's opinion represents a satisfactory resolution of the complex issues that would have been raised in that contingency.

As amended, effective April 1, 1978, section 28 of article VI was the centerpiece of a group of constitutional amendments that significantly revamped court administration in this State.

Prior to the amendment, the section vested authority and responsibility for the administrative supervision of the court system in the Administrative Board of the Judicial Conference, consisting of the Chief Judge of the Court of Appeals and the Presiding Justices of the Appellate Divisions; provided that the administrative board, in consultation with the Judicial Conference, was to establish standards and administrative policies for general application throughout the State; and authorized the Appellate Divisions to supervise the administration and operation of the courts in their respective departments in accordance with such standards. In substance, the amendment transferred administrative responsibility from the administrative board to the Chief Judge of the Court of Appeals and a Chief Administrator acting on his behalf, and withdrew from the Appellate Divisions their prior constitutional authority to supervise the administration and operation of the courts in their respective departments.

Article VI (§ 28, subd a) states in pertinent part that the Chief Judge of the Court of Appeals shall be the Chief Judicial Officer of the Unified Court System; that there shall be an Administrative Board of the courts consisting

of the Chief Judge as chairman and the Presiding Justices of the Appellate Divisions; and that the Chief Judge, with the advice and consent of the administrative board, shall appoint a Chief Administrator of the courts who shall serve at his pleasure.

Subdivision b provides that the Chief Administrator, on behalf of the Chief Judge, shall supervise the administration and operation of the Unified Court System, and in the exercise of that responsibility, shall have such powers and duties as may be delegated to him by the Chief Judge and such additional powers and duties as may be provided by law.

Finally, subdivision c sets forth the following: "c. The chief judge, after consultation with the administrative board, shall establish standards and administrative policies for general application throughout the state, which shall be submitted by the chief judge to the court of appeals, together with the recommendations, if any, of the administrative board. Such standards and administrative policies shall be promulgated after approval by the court of appeals."

At the same time, and also to become operative on April 1, 1978, article VI (§ 26, subd i) was amended to state: "i. Temporary assignments of all the foregoing judges or justices listed in this section shall be made by the chief administrator of the courts in accordance with standards and administrative policies established pursuant to section twenty-eight of this article."

Effective April 1, 1978, the same day that the above constitutional amendments became operative, then Chief Judge BREITEL, after consultation with the administrative board and with the approval of the Court of Appeals, promulgated the first group of standards and administrative policies to be adopted pursuant to the new constitutional provisions. The first of the standards and policies promulgated, then numbered subdivision (a) of section 445.1 of the Rules of the Chief Judge (22 NYCRR 445.1 [a]) presents the issue of construction that seems to me decisive on this appeal. As will become apparent, however, an understanding of this dispositive issue requires consideration also of other standards and administrative policies

then promulgated as well as the preamble in which the Chief Judge set forth quite explicitly their purpose.

The document is captioned: "STANDARDS AND ADMINISTRATIVE POLICIES EFFECTIVE APRIL 1, 1978". Preliminarily it states that the standards and policies were promulgated by the Chief Judge pursuant to article VI (§ 28, subd c) of the State Constitution, with approval of the Court of Appeals, and had been developed in consultation with the Administrative Board of the Courts. There follows a preamble which states:

"The purpose of these standards and policies is to assign and regulate administrative authority in a complex, multi-tiered court system. The Constitution now vests in a Chief Administrator of the Courts, on behalf of the Chief Judge, responsibility for supervising the administration and operation of our courts. Heretofore this has been the constitutional responsibility of the Appellate Divisions of the Supreme Court and the Administrative Board of the Judicial Conference. These standards and policies reflect the judgment of the Chief Judge and of the Court of Appeals that sound management of our court system requires that the Appellate Divisions, through their Presiding Justices, have a significant consultative role in management decisions which affect the trial courts in each of the diverse areas of our State. This participation of the Appellate Divisions in court administration is consistent with our judicial tradition and is important to the intelligent and effective exercise of the Chief Administrator's constitutional functions and responsibilities.

"Paramount, however, is the constitutional mandate for a unified administration of the courts, within the framework of which the consultative role of the Appellate Divisions may appropriately function. The Chief Administrator should also consult with the trial judges, the Bar, and the public, either directly or through deputies, local administrative judges, and advisory committees."

The newly promulgated standards and administrative policies are set forth in three sections. The first section, captioned "Chief Judge and Chief Administrator; exercise of administrative powers and duties," is divided into six

lettered subdivisions (a) through (f). (22 NYCRR 445.1 [a]-[f].)

Subdivision (a) sets forth the standard and administrative policy whose construction is central here: "(a) Establishment of the regular hours, terms and parts of court, and assignments of judges and justices to them, other than temporary assignments, shall be done in consultation and agreement with the presiding justices of the appropriate appellate divisions on behalf of their respective courts; provided that if the Chief Administrator and a presiding justice are unable to agree, the matter shall be determined by the Chief Judge. Retired judges or justices certificated pursuant to article VI, section 25 of the Constitution shall be subject to assignment by the Appellate Divisions pursuant to that section, in consultation with the Chief Administrator."

Subdivision (b) authorizes the appointments of nonjudicial officers and employees "upon nomination of the appropriate administrative judge, supervising judge or judge of the court in which the position is to be filled, or other administrator designated by the Chief Administrator." It also confirms the authority of Judges and Justices to continue to appoint and remove personal assistants who serve as law clerks and secretaries, subject to standards and administrative policies and to budgetary determination.

Subdivision (c) requires that designation of the places where Appellate Terms shall be held "shall be made in consultation with the presiding justices of the appropriate Appellate Divisions."

Subdivision (d) directs that adoption of administrative rules for the efficient and orderly transaction of business in the trial courts "shall be done in consultation with the Administrative Board of the Courts or the appropriate Appellate Divisions."

Subdivision (e) requires the Chief Judge, if he designates Deputy Chief Administrators and Administrative Judges, to do so in consultation with the Presiding Justices on behalf of their respective courts. If such designations are made by the Chief Administrator pursuant to delegated

authority "they shall be made in consultation with the presiding justices * * * and shall require the approval of the Chief Judge."

Subdivision (f) provides that designation of the Presiding Justice and Associate Justices of an Appellate Term "shall require the approval of the presiding justice of the appropriate Appellate Division."

Section 445.2 headed "Chief Administrator of the Courts; compensation" in substance authorized the Chief Judge to fix the salary of the Chief Administrator.

Section 445.3, under the heading "Existing rules" sets forth the following in subdivision (a): "(a) All rules and standards of the Administrative Board of the Judicial Conference, except Part 33 (rules governing judicial conduct), in effect on March 31, 1978, shall be continued in effect as standards and administrative policies established, approved and promulgated pursuant to article VI, section 28 (c) of the Constitution, until expressly superseded by new rules or standards and administrative policies. Unless a contrary construction is required, references to the Administrative Board of the Judicial Conference shall be deemed references to the Chief Judge of the Court of Appeals; references to the State Administrator and State Administrative Judge shall be deemed references to the Chief Administrator of the Courts; and references to the Appellate Divisions shall be deemed references to the Chief Administrator of the Courts."

Finally, subdivision (b) of section 445.3 requires the Chief Judge or Chief Administrator, "[b]efore amending or repealing an administrative rule of an Appellate Division for the efficient and orderly transaction of business in the trial courts, including but not limited to calendar practice, that was in effect on March 31, 1978", to consult with that Appellate Division.

The critical issue on this appeal concerns the interpretation of subdivision (a) of section 445.1 and in particular the phrase "other than temporary assignments". Petitioners argue in essence that this phrase excluded temporary assignments from the scope of the section, and that, in the absence of any other standard and policy regulating tem-

porary assignments, the respondents lack the authority to adopt the plan for making temporary assignments which gave rise to these proceedings. As against this, respondents contend that the phrase "other than temporary assignments" was intended only to exempt such assignments from the requirement fixed as to the establishment of regular hours, terms and parts of courts and assignments of Judges and Justices to them that the Chief Administrator consult with the Presiding Justice of the affected Appellate Division, and that in the event of a disagreement, the Chief Judge was to make the final determination.

As a matter of textual analysis either construction is verbally plausible. If, however, subdivision (a) of section 445.1 is considered with the group of standards and policies then promulgated of which it was an integral part, and in light of their plainly articulated purposes, the construction urged by respondents appears much more probably correct.

In the promulgation of the above-described standards and administrative policies, the Chief Judge and the Court of Appeals were seeking to accomplish two central purposes.

One, set forth in subdivision (a) of section 445.3, was to establish the continuing validity of the existing rules and standards of the Administrative Board of the Judicial Conference as standards and administrative policies pursuant to article VI (§ 28, subd c) of the Constitution until expressly superseded by new rules or standards and administrative policies.

The second purpose, responding to the changes brought about by the newly operative constitutional provisions, was to "assign and regulate administrative authority in a complex multi-tiered court system."

In the preamble quoted above it was made clear that the Chief Judge and the Court of Appeals wished to preserve for the Appellate Divisions, and more particularly the Presiding Justices, "a significant consultative role in management decisions which affect the trial courts in each of the diverse areas of our State." This statement, however, is followed by the observation: "Paramount, however, is the constitutional mandate for a unified administration of the

courts, within the framework of which the consultative role of the Appellate Divisions may appropriately function."

In short, as the preamble plainly indicates, and a study of the promulgated standards confirms, a primary concern was to define precisely the new, limited role of the Appellate Divisions in court administration, and more particularly, the role of the Presiding Justices, and to identify explicitly those areas as to which consultation with the Presiding Justices, or their approval, was to be required.

When the standard and administrative policy promulgated in subdivision (a) of section 445.1 is considered in light of these purposes, and together with the other standards then adopted, its meaning with regard to the issue presented is apparent. As to "regular hours, terms and parts of court, and assignments of judges and justices to them" the Chief Administrator was required to consult with the Presiding Justices, and in the event of a disagreement, the issue was to be resolved by the Chief Judge. As to temporary assignments, it was decided not to require such consultation. It is surely not difficult to understand that the Chief Judge concluded with regard to hundreds of temporary assignments, varying widely in character, importance and duration, and including many of an emergency nature, that it was, on balance, unwise to require the Chief Administrator to consult as to each such assignment with a Presiding Justice and to impose on the Chief Judge the burden of resolving any disagreement that might develop. This interpretation is consonant with the clear import of the entire group of standards and administrative policies simultaneously promulgated which are primarily concerned "to assign and regulate administrative authority in a complex, multi-tiered court system," and to demarcate precisely the circumstances under which consultation with, or the approval of, the Presiding Justices, was required.

Although verbally plausible, the construction urged by the petitioners, and accepted by the court majority, makes no sense whatever when considered in light of the problems that the Chief Judge and the Court of Appeals were

addressing in the promulgated standards and administrative policies, and their clearly stated purposes. On April 1, 1978, as now, the efficient operation of the court system depended in large part on the expeditious and orderly making of temporary assignments. Scores of Judges were then functioning on the basis of temporary assignments. It was critically important that such assignments continue to be made without interruption for the court system to function appropriately. The interpretation advanced by petitioners requires us to accept that the Chief Judge and the Court of Appeals, obviously aware of this reality, promulgated a standard and administrative policy that carefully, and inexplicably, removed from its effective scope the power to make temporary assignments, leaving the Chief Administrator's authority to exercise that essential power, specifically vested in him by the Constitution, in some peculiar kind of legal limbo.

In evaluating this thesis, it is pertinent to note that the standards and administrative policies adopted effective April 1, 1978 were promulgated by Chief Judge BREITEL, the person most closely identified with the constitutional amendments that the standards and administrative policies were designed to implement, and who had an unequaled understanding of the meaning of the constitutional amendments. The court's opinion fails to account for the remarkable omission that it in effect attributes to Chief Judge BREITEL and to the Court of Appeals, an omission that puts in doubt the validity of every temporary assignment thereafter made no less than any temporary assignment that may be made pursuant to the rotation plan in issue here.

I can think of only two conceivable explanations for an error of the magnitude implicitly attributed to Chief Judge BREITEL and to the Court of Appeals, neither of which is remotely satisfactory.

First, Chief Judge BREITEL may have excluded temporary assignments from the scope of subdivision (a) of section 445.1, intending to address that function separately, but failed to do so through some uncharacteristic oversight or inadvertence, and the omission somehow was not called to his attention by his colleagues on the Court of Appeals,

the members of the Administrative Board, the Chief Administrator, the Deputy Administrators or the staff of the Office of Court Administration.

The second is that the Chief Judge did not interpret the Constitution to require a standard and administrative policy for the exercise by the Chief Administrator of the power to make temporary assignments, notwithstanding the apparently explicit language to that effect in article VI (§ 26, subd i), and although such a standard and administrative policy could have been easily formulated and simply phrased, he chose not to promulgate one without explicitly stating the constitutional basis for that decision.

Neither of these explanations seems to me viable, although one or the other, or something very close to either, is essential to the construction of subdivision (a) of section 445.1 adopted in the court's opinion. Confronted with a choice between two verbally plausible constructions of subdivision (a) of section 445.1, one necessarily attributing an astonishing error or oversight in implementing the constitutional amendments to the person most knowledgeable about their meaning and intent, and a second which is consistent with the amendments, the language of the standard and administrative policy, its stated purposes, and the obvious realities of the situation, I am unable to understand why the court should reject the interpretation which makes sense and adopt that which does not.

Closely linked to the court's erroneous construction of subdivision (a) of section 445.1, and contributing significantly to it, is what appears to me a fundamental misunderstanding of the meaning of a constitutionally required standard and administrative policy. In effect, the court is holding that the rotation plan, with its provision for a screening committee and its detailed statement of how rotation is to be achieved, is a standard and administrative policy of the kind required by the Constitution to be adopted only after consultation with the administrative board and the approval of the Court of Appeals. The error in this conclusion is quickly revealed by a comparison of the rotation plan with the general delegations of authority in the standards and administrative policies adopted contemporaneously with the constitutional amendments by

those most intimately familiar with the meaning of the amendments. The rotation plan is obviously not a constitutional standard and administrative policy, but rather a detailed plan for implementing the power to make temporary assignments conferred on the Chief Administrator by the Constitution and, in my view, confirmed in subdivision (a) of section 445.1.

Any possible doubt on the issue seems to me to have been definitively removed when, effective January 1, 1982, following consultation with the administrative board and approval of the Court of Appeals, the Rules of the Chief Judge were revised, and the rule at issue here, renumbered section 1.1 (a), was amended to read as follows: "1.1 Chief Judge and Chief Administrator; Exercise of administrative powers and duties. (a) Establishment of the regular hours, terms and parts of court, <u>other than temporary hours, terms and parts,</u> and assignments of judges and justices to them, other than temporary assignments, shall be done in consultation and agreement with the presiding justices of the appropriate [appellate divisions] <u>Appellate Divisions</u> on behalf of their respective courts; provided that if the Chief Administrator and a presiding justice are unable to agree, the matter shall be determined by the Chief Judge. Retired judges or justices certificated pursuant to article VI, section 25 of the Constitution shall be subject to assignment by the Appellate Divisions pursuant to that section, in consultation with the Chief Administrator." (Deletions in brackets, additions underlined.)

Surely it cannot be seriously argued that the addition of the qualifying clause underlined above, "other than temporary hours, terms and parts," was designed by the Chief Judge to withdraw from the Chief Administrator the power to establish such temporary hours, terms and parts. And yet, to be consistent with the construction advanced by the petitioners with regard to the phrase "other than temporary assignments", such a construction, absurd though it is, would be required.

For the foregoing reasons, the judgment and dismissal of the petition for a writ of prohibition entered in the Supreme Court, New York County (TYLER, J.), on January 25,

1981, should be affirmed, and the petition of the intervenor should be dismissed.

SULLIVAN, MARKEWICH, LUPIANO and BLOOM, JJ., concur; SANDLER, J. P., dissents in an opinion.

Judgment, Supreme Court, New York County, entered on January 25, 1982, reversed, on the law, without costs and without disbursements, and the petition for a writ of prohibition considered as though a complaint in an action for declaratory judgment, in which judgment should be entered in favor of plaintiff (petitioner)-appellant declaring that subdivision i of section 26 and subdivision c of section 28 of article VI of the Constitution of the State require that the new rotation plan of temporary assignment of Judges of the courts of the City of New York requires, as prerequisite to promulgation, the adoption of a standard and administrative policy in respect of the same, as well as consultation theretofore by the Chief Judge with the Administrative Board of the Courts and approval by the Court of Appeals and that there was no compliance therewith prior to promulgation of the plan or at any time, and that therefore that plan of temporary assignment is without effect and void in respect of the manner of its promulgation.